**JS-6**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

IN RE MERUELO MADDUX
PROPERTIS, INC.

CASE NO.
2:11-cv-5458-SVW
2:11-cv-5577-SVW
2:11-cv-5655-SVW
2:11-cv-5832-SVW

**IN CHAMBERS ORDER Re APPEAL [1]**

## I.   INTRODUCTION

Meruelo Maddux Properties, Inc. ("MMPI") was incorporated in 2006.  Richard Meruelo was Chief Executive Officer and Chairman of the Board; John Maddux was President, Chief Operating Officer, and a Board Member.  In 2007, MMPI completed its initial public offering, after which Meruelo owned approximately 39,911,378 shares, representing 45.3 percent of outstanding shares, and Maddux (and related entities) owned approximately 5,797,588 shares, or 6.6 percent of outstanding shares.  Together, Meruelo and Maddux owned about 51.9% of MMPI's approximately 88 million shares of outstanding common stock.[1]

---

[1] The Court refers to Meruelo and Maddux as the "Insider Equity Holders," as they controlled a majority of MMPI's shares, and were also MMPI officers and members of the MMPI Board.

On March 26 and 27, 2009, MMPI and 53 of its subsidiary companies filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   In 2009 and 2011, the Insider Equity Holders (essentially, Meruelo and Maddux) proposed a series of reorganization plans; none were accepted by the Bankruptcy Court. ER 1830-1837.[2]   In June of 2010, the Bankruptcy Court gave Charlestown, a MMPI shareholder that owned approximately 2 percent of the corporation (or 1,762,800 shares) the opportunity to propose a competing plan.   ER 1831.   In August of 2010, the Bankruptcy Court gave Legendary Investors Group No. 1, LLC and East West Bank (together the "Legendary" group) the opportunity to propose a competing plan.   ER 1832.[3]   The Insider Equity Holders, Charlestown, and Legendary each proposed a series of amended plans.   ER 1832-1838.   On January 27, 2011, the Bankruptcy Court began a trial as to the Final Proposed Charlestown Plan, and the Final Proposed Insider Equity Holders' Plan.[4]   ER 1838.   During the course of the trial, each party proposed modifications to their respective plans.   Id. At a hearing held on May 19, 2011, the Bankruptcy Court announced

---

[2] "ER" refers to the excerpts of record.

[3] It is unclear whether the Legendary group was somehow involved in MMPI before it filed its petition (as a lender or equity interest holder).

[4] Trial did not commence as to the final plan proposed by Legendary; after the trial began, the Legendary group withdrew its final proposal.   ER 1838.

1    that it would confirm the Final Proposed Charlestown Plan, with one

2    Court-imposed modification discussed below.   ER 1152.

3        As proposed, the Final Charlestown Plan was "fully consensual"

4    as to all creditors,[5] and provided that MMPI would come out of

5    bankruptcy as a newly formed corporation.[6]  ER 1890.  The Plan

6    further divided the pre-petition equity interests into two classes—

7    stock held by Meruelo, Maddux, and other officers of MMPI (the

8    Insider Equity Holders) and stock held by all others (the "Non-

9    Insider Equity Holders").[7]  The Final Charlestown Plan gave both

10   Insider and Non-Insider Equity holders the option of either 1)

11   retaining their existing shares in the reorganized corporation; or,

12   2) exchanging their shares for 35 cents apiece, with an important

13   caveat discussed in the following paragraph.  Charlestown argued

14   that 35 cents a share was the "price on which a buyer and seller

15   would agree in an arm's length transaction."  ER 1880.  In support

16

17   _____

18       [5] A plan is "consensual" as to a creditor's pre-petition
     interest if it either 1) pays the creditor in full; or, 2) is agreed
19   to by an "impaired" creditor.  Generally, a creditor's claim "is
     considered 'impaired' for purposes of voting on a Chapter 11 plan
20   unless the plan leaves the creditor's legal, equitable, and
     contractual rights unaltered, or the debtor 'cures' any default that
21   occurred prior to or during the bankruptcy case."  Gen. Elec.
     Capital Corp. v. Future Media Prods., Inc., 547 F.3d 956, 960 (9th
22   Cir. 2008) (citing 11 U.S.C. § 1124).

23       [6] The newly formed corporation is EVOQ Properties, Inc.  As
24   discussed below, after the Bankruptcy Court approved the Final
     Charlestown Plan, a newly formed LLC—MMPI Acquisition—owned 55
25   percent of EVOQ.

26

27       [7] Charlestown was only one of several members of the Non-Insider
     Equity Holders, as it owned 2% of pre-petition MMPI shares.

28

3

of this assertion, Charlestown offered the testimony of Stephen
Taylor, the chairman of the Official Committee of Equity Holders
(the "OEC").  ER 1880. [8]  During the confirmation trial, the Insider
Equity Holders argued that 35 cents a share proposed by Charlestown
undervalued the stock of the reorganized debtor.  In support of
their contention, the Insider Equity Holders offered the declaration
of M. Freddie Reiss, a senior managing director at FTI Consulting,
Inc.  ER 847-858.  However, Reiss's declaration did *not* offer an
opinion as to the value of the reorganized stock.  Instead, he
stated only that the *Insider Equity Holders'* estimate of the value
of the reorganized corporation was $278.4 million, and that, based
on this estimate, 35 cents a share undervalued the stock.[9]  ER 849-

---

[8] Under the Bankruptcy Code, the Bankruptcy Court may, "on
request of a party in interest," appoint a committee of "equity
holders if necessary to assure adequate representation of . . .
equity security holders."  11 U.S.C. § 1102(a)(2).  Different groups
of equity holders may request appointment of their own committee.
See In re Drexel Burnham Lambert Grp., Inc., 118 B.R. 209, 212
(Bankr. S.D.N.Y. 1990) ("[T]he chief concern of adequacy of
representation is whether it appears that different classes of debt
and equity holders may be treated differently under a plan and need
representation through appointment of additional committees.").  The
OEC was appointed by the Office of the United States Trustee in July
of 2010, and the members changed during the course of the
proceedings in the Bankruptcy Court.  ER 1829.  It is unclear from
the record who sat on the OEC, although it appears that the OEC
represented *Non*-Insider Equity Holders.  See ER 1890 (commenting
that the OEC was the "official representative" of the Non-Insider
Equity Holders).  Moreover, there is no evidence in the record that
the Insider Equity Holders requested appointment of their own,
separate, committee.

[9] As the Insider Equity Holders repeatedly argue in their
briefs, if the value of the reorganized debtor was $278 million, if
the value of the reorganized debtor was $278 million, the per share
price should have been $3.16 ($278 million/88 million shares of pre-
petition stock).

4

850.  Reiss's declaration does not state how the Insider Equity Holders arrived at their conclusion that the reorganized corporation was worth $278 million.

As noted above, the Final Charlestown Plan included one additional requirement as to the equity interest holders.  Under the proposed plan, at least 55 percent of existing stock would have to be sold to a newly formed entity—MMPI Acquisition, LLC.[10]  Thus, any equity holder (whether Insider or Non-Insider) that chose *not* to sell its shares would be forced to sell its shares on a pro-rata basis until the newly formed MMPI Acquisition owned 55 percent of stock in the newly formed corporation.[11]  In exchange for this equity interest, MMPI Acquisition would contribute $23.6 million in cash to be "used first to purchase 55% of the shares of MMPI Existing Common Stock for $0.35 per share," with "[t]he remainder of such $23.6

---

[10] The Insider Equity Holders contend that Charlestown owned MMPI Acquisition; however, their citations to the record establish only that MMPI Acquisition was the proposed purchaser of a 55 percent interest in the reorganized debtor, *not* that Charlestown own MMPI Acquisition.  Moreover, even assuming that Charlestown did own MMPI Acquisition, it does not change this Court's analysis.

[11] For example, suppose that, pre-petition, there had been three stockholders in MMPI: the first, stockholder A, owned 10 percent; the second, stockholder B, owned 30 percent; and the third, stockholder C, owned 60 percent.  Now assume that stockholder A decides to sell all of her stock to the newly formed MMPI Acquisitions, but that stockholders B and C chose not to.  The Final Charlestown Plan required stockholders B and C to sell, on a pro-rata basis, enough of their shares for MMPI Acquisition to gain ownership over an additional 45 percent.  As applied to this example, it would require stockholders B and C to each sell half of their shares, and the resulting ownership structure would give MMPI Acquisition 55 percent of the newly formed corporation, stockholder B 15 percent, and stockholder C thirty percent.

1  million [to be] used for any corporate purpose." SER 801.[12]   MMPI

2  Acquisition had also obtained a commitment for a secure loan in the

3  amount of $15 million to use "in funding the operations and payments

4  under the Charlestown Plan." SER 801-802.   Because the Insider

5  Equity Holders did not wish to sell their shares, the proposed Final

6  Charlestown Plan had an additional consequence.   As the Bankruptcy

7  Court concluded, "[t]he practical effect of this treatment is that

8  some equity holders who chose to retain their stock under the [Plan]

9  will have to sell a portion of their shares for $0.35.   The further

10  implication is that current 'insider' shareholders, who hold more

11  than 50 [percent] of the common stock, will become minority

12  shareholders."   ER 982.[13]

13      By contrast, the Final Proposed Insider Equity Holders' plan

14  would have impaired nearly $70 million of secured debt over those

15  creditor's objections.   ER 1891.   An additional $60 million worth of

16  secured debt indicated that, although it was amenable to either

17  plan, it preferred the Final Charlestown Plan.   Id.   Moreover, the

18  Final Proposed Insider Equity Holders' Plan would have provided all

19  pre-petition equity interests $0.25 a share.   ER 1877.

---

[12] "SER" refers to the supplemental excerpts of record.

[13] It is unclear from the record how many shareholders
voluntarily sold their shares, and how many were forced to sell
them, and which shareholders owned what percentage of the newly
organized corporation after the Bankruptcy Plan was confirmed.   What
is certain is that MMPI Acquisition owned 55 percent of the new
corporation as a result of the confirmation of the Plan, and that
Meruelo and Maddux became "minority" shareholders.

As noted above, the Bankruptcy Court made one modification to the proposed Final Charlestown Plan. In response to the Insider Equity Holders' contention that the 35 cents a share proposed by the Final Charlestown Plan undervalued the reorganized corporation's stock, the Bankruptcy Court required MMPI Acquisition to pay Insider Equity Holders—but *not* Non-Insider Equity Holders—45 cents a share for each share sold. The Bankruptcy Court notified the parties that it would be awarding Insider Equity Holders this price in a tentative ruling issued the day of the final confirmation hearing. ER 981-985. In determining that this was the appropriate price, the Bankruptcy Court took judicial notice of the fact that there was an "over the counter market for MMPI shares," and that on May 18, 2011, "the day prior to the Court's ruling confirming the Charlestown Plan," shares of MMPI traded at "$.45 a share with a trading volume in 23,700 shares (and with a volume as high as 179,000 shares as recently as March 21, 2011)." ER 1881. In relying on the "pink sheet"[14] price of $.45 a share as an accurate value of the stock, the Bankruptcy Court further relied upon evidence indicating that in February of 2011, "some 300,000 shares" of MMPI stock were sold for an average of $.50 a share. Id.

With this adjustment, the Bankruptcy Court confirmed the Final Charlestown Plan. In its written order confirming the plan, the

---

[14] "Pink sheets refer to a securities trading system that is not regulated by the Securities and Exchange Commission. Companies are not required to file periodic reports or audited financial statements." Gearing v. China Agritech, Inc., 2012 WL 2890806, at *1 (C.D. Cal. July 16, 2012).

1   Bankruptcy Court found that the Final Charlestown Plan met the

2   Code's requirements for confirmation.   See 11 U.S.C. § 1129.   Among

3   other things, the Bankruptcy Court found that the Final Charlestown

4   Plan treated the Insider Equity Holders' interest "fairly and

5   equitably" as required by Section 1129(b).

6       On appeal, the Insider Equity Holders make two arguments.

7   First, they contend that the Bankruptcy Court's conclusion that the

8   plan was "fair and equitable" was erroneous.   Specifically, the

9   Insider Equity Holders argue that the Bankruptcy Court erred by

10  relying on the pink sheets to assess the value of the reorganized

11  debtors' stock.   Secondly, the Insider Equity Holders argue that it

12  was procedurally incorrect for the Bankruptcy Court to rely on the

13  pink sheet trading price, both because it was not evidence in the

14  record and because the late hour at which it informed the parties

15  that it would be relying on the pink sheet price gave the Insider

16  Equity Holders insufficient time to prepare and present evidence as

17  to why that valuation figure was incorrect.

18  **II.   STANDARD OF REVIEW**

19

20      This Court reviews the Bankruptcy Court's "interpretation of

21  the Bankruptcy Code de novo and its factual findings for clear

22  error."   Blausey v. U.S. Tr., 552 F.3d 1124, 1132 (9th Cir. 2009);

23  see also In re Cogar, 210 B.R. 803, 808 (B.A.P. 9th Cir. 1997) ("An

24  order approving a reorganization plan is reviewed for an abuse of

25  discretion.   A court abuses its discretion when it bases its

26
    decision on an erroneous view of the law or a clearly erroneous view
27
    of the facts.") (internal citation and quotation marks omitted).
28

1    Appellants do not take issue with the plan of reorganization,
2    *except* for the valuation methodology employed by the Bankruptcy
3    Court.  Valuation questions are mixed questions of law and fact.
4    See In re Ebbler Furniture and Appliances, Inc., 804 F.2d 87, 89
5    (7th Cir.1986).  "The bankruptcy court's selection and application
6    of valuation methodology is primarily a legal matter," and thus
7    subject to *de novo* review, "whereas the findings made under the
8    selected valuation standard are factual," and thus reviewed for
9    clear error.  Nat'l Rural Utilities Co-op. Fin. Corp. v. Wabash
10   Valley Power Ass'n, Inc., 111 B.R. 752, 767 (S.D. Ind. 1990) (citing
11   Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.
12   v. Anderson, 390 U.S. 414, 445 (1968)).

13   Finally, as this Court "functions as an appellate court in
14   reviewing a bankruptcy decision and applies the same standards of
15   review as a federal court of appeals, [it] may also affirm a
16   bankruptcy's order on any ground supported by the record."  In re
17   Crystal Properties, Ltd., L.P., 268 F.3d 743, 755 (9th Cir. 2001)
18   (internal citations and quotation marks omitted).

19   **III. DISCUSSION**

20   **A. Fair and Equitable**

21   Before confirming a bankruptcy plan, a bankruptcy court has an
22   "an affirmative duty to ensure that the [p]lan satisfie[s] all 11
23   U.S.C. § 1129 requirements for confirmation."  In re Ambanc La Mesa
24   Ltd. P'ship, 115 F.3d 650, 653 (9th Cir. 1997).  Plan proponents
25
26
27
28

9

1  have the burden of proving by a preponderance of the evidence that a

2  plan meets these requirements.  Id.[15]

3        Section 1129 provides two avenues through which a plan

4  proponent may demonstrate compliance with Section 1129.  First, the

5  proponent may demonstrate that the plan satisfies each of Section

6  1129(a)'s requirements.  In re Ambanc, 115 F.3d at 653; see also 11

7  U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the

8  following requirements are met . . . .").  Among other things,

9  Section 1129(a) requires that each impaired class of creditors and

10  shareholders accepts the plan.  See 11 U.S.C. § 1129(a)(8) ("With

11  respect to each class of claims or interests, (A) such class has

12  accepted the plan; or (B) such class is not impaired under the

13  plan.").[16]

14        The second path to approval is known as the "cramdown"

15  alternative, and is set forth in Section 1129(b).  For a plan to be

16  confirmed under Section 1129(b), a plan proponent must first

17  demonstrate that that the plan meets all of Section 1129(a)'s

18  criteria *except* the eighth.  See In re Ambanc, 115 F.3d at 653

19  (holding that a bankruptcy court must confirm a plan if "the Plan

20  satisfies all thirteen requirements of 11 U.S.C. § 1129(a)," or "if

21  the only condition not satisfied is the eighth requirement, 11

---

23  [15] The Bankruptcy Code permits "[a]ny party in interest,"
24  including an "equity security holder" to file a plan under certain
   conditions.  11 U.S.C. § 1121(c).  There is no dispute that
25  Charlestown was permitted to propose a plan under the Bankruptcy
   Code.

27  [16] Because this requirement is listed in Section 1129(a)(8), it
   is often referred to as the "eighth" requirement.

U.S.C. § 1129(a)(8), the Plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b)"); see also In re Paige, 685 F.3d 1160, 1183 (10th Cir. 2012) (same).  If the plan satisfies all of Section 1129(a)'s requirements other than the eighth, then it may be approved *if* it complies with Section 1129(b)(1).  Section 1129(b)(1) provides that a plan may be approved if it does not "discriminate unfairly" against each impaired class that has not accepted the plan, and treats each such class "fair[ly] and equitabl[y]."  11 U.S.C. § 1129(b)(1); see also In re Ambanc, 115 F.3d at 653.[17]

The phrase "fair and equitable" "is not a vague exhortation to bankruptcy judges that they do the right thing[.]"  In re Perez, 30 F.3d 1209, 1212 (9th Cir. 1994).  Rather, the term "reflect[s] and stand[s] proxy for almost a century of judicial decision-making, and over half a century of legislative guidance."  7 COLLIER ON BANKRUPTCY § 1129.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (hereinafter, "COLLIER").  Principally, the fair and equitable requirement "implements the so-called absolute priority rule, under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all."  In re Perez, 30 F.3d at 1212-13; see also In re Castleton Plaza, LP, 707 F.3d 821, 821 (7th Cir. 2013) ("Creditors in bankruptcy are entitled to full payment before equity investors can receive anything.  This is

---

[17] The Insider Equity Holders do not argue that the Final Charlestown Plan unfairly discriminated against their interest.

the absolute-priority rule."). The absolute priority rule has been
codified at Section 1129(b)(2),[18] which provides in relevant part:

> For the purpose of this subsection, the condition that a plan
> be fair and equitable with respect to a class includes the
> following requirements . . .
>
>> (C) With respect to a class of interests—
>>
>>> (i)   the plan provides that each holder of an
>>>       interest of such class receive or retain on
>>>       account of such interest property of a value,
>>>       as of the effective date of the plan, equal to
>>>       the greatest of the allowed amount of any fixed
>>>       liquidation preference to which such holder is
>>>       entitled, any fixed redemption price to which
>>>       such holder is entitled, or the value of such
>>>       interest; *or,*
>>>
>>> (ii)  the holder of any interest that is junior to
>>>       the interests of such class will not receive or
>>>       retain under the plan on account of such junior
>>>       interest any property.

11 U.S.C. § 1129(b)(2)(C) (emphasis added).[19]

In this case, the Insider Equity Holders do *not* argue that the
Final Charlestown Plan violated the absolute priority rule.  Nor
could they: under the Final Charlestown Plan, *no class junior to the
Insider Equity holders received anything of value.*  In the language

---

[18]   Although Section 1129(b)(1) "sets forth a complete test for
nonconsensual confirmation, Congress added [Section 1129(b)(2)] to
illustrate some of the components of the fair and equitable rule."
COLLIER § 1129.04.


[19]  1129(b)(2)(C) details the minimum requirements that a plan
must meet if it impairs an objecting class of *equity* interests.
1129(b)(2)(A) and (B) detail the requirements for impaired,
objecting classes of secured and unsecured creditors, respectively.

of the statute, *no* "holder of any interest that is junior to" the
Insider Equity holder's "receive[d] or retain[ed]" any property on
account of such junior interest in the property.   11 U.S.C. §
1129(b)(2)(C)(ii).

   Instead, the Insider Equity Holders argue—and the Bankruptcy
Court agreed—that, in these circumstances, Section 1129(b)'s "fair
and equitable" requirement demanded that they receive the "fair
market value" of the stocks they were forced to sell. [20]   Because the

---

[20] As an initial matter, it appears that the Bankruptcy Court's
holding that the Insider Equity Holders were required to receive the
"fair market value" of their stock *if* the Final Charlestown Plan
complied with Section 1129(b)(2)(C)(ii) was an incorrect reading of
the statute.   Section 1129(b)(2)(C) provides that a plan may comply
with the absolute priority rule *either* by providing each holder of
an impaired interest that objects to a plan with "the value of such
interest,"   11 U.S.C. § 1129(b)(2)(C)(i), *or* by ensuring that no
interests junior to the Insider Equity Holders "receive[d] or
retain[ed] [any property] under the plan on account of such junior
interest."   11 U.S.C. § 1129(b)(2)(C)(ii).   By mandating that the
Insider Equity Holders receive the "fair market value" of their
stock, the Bankruptcy Court effectively transformed the word "or" in
Section 1129(b)(2)(C) into an "and," an interpretation at odds with
the plain language of the statute.   See In re Philadelphia
Newspapers, LLC, 599 F.3d 298, 305 (3d Cir. 2010) ("The use of the
word 'or' in [Section 1129(b)(2)(A), the provision detailing how a
plan may meet the fair and equitable requirement with respect to
*secured* impaired creditors] operates to provide alternatives—a
debtor may proceed under subsection (i), (ii), *or* (iii), and need
not satisfy more than one subsection.   This approach is consistent
with the definitions provided by the Code.   Section 102(5) provides
'that 'or' is not exclusive[.]' 11 U.S.C. § 102(5). The statutory
note to § 102(5) further explains that 'if a party 'may do (a) or
(b)', then the party may do either or both.'") (citations omitted).

   Notwithstanding this apparently incorrect reading of the
statute, the Court will assume for purposes of this appeal that
Section 1129(b)(1)'s "fair and equitable" mandates that the Insider
Equity Holders received the fair market value of the equity interest
they were forced to sell, and, as such, the Bankruptcy Court was
required to value the reorganized debtors' stock.

Code requires that they receive the fair market value of their sold stocks, the Insider Equity Holders argue, the Bankruptcy Court was required to use certain valuation methodologies to assess the fair market value of the stock of the reorganized debtor.  And, according to the Insider Equity Holders, the valuation methodology employed by the Bankruptcy Court—reference to the pink sheets—was reversible error.  As noted above, see supra Section II, this issue—the use a particular valuation method—is a legal matter, which this Court reviews de novo.[21]

### B. Valuation

#### 1. Reliance on the Pink Sheets

Contrary to the Insider Equity Holders' contention, the Bankruptcy Court did not err in relying upon the pink sheet price in assessing the value of the reorganized debtor's stock.  The Insider Equity Holders argue that, in order to assess the value of the reorganized debtor, the Bankruptcy Court was required to rely on an expert's estimate of the value of the assets and debts, as well as the future earning capacity of the reorganized entity.  This assertion runs counter to the increasingly "strong preference for market-based valuations."  COLLIER § 1129.05[3][b]; see also Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999 ) ("[O]ne of the Code's innovations to narrow the occasions for courts to make valuation judgments[.]").  As the Third

---

[21] The Insider Equity Holders do not argue here—nor did they in the Bankruptcy Court—that, as a factual matter, the pink sheet price of 45 cents a share was incorrect.

Circuit has held, "[a]bsent some reason to distrust it, *the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.*" VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (internal citations and quotation marks omitted) (emphasis added); see also Matter of Prince, 85 F.3d 314, 320 (7th Cir. 1996) ("Due to the [difficulties in approximation that accompany an expert's valuation analysis], where market information is available, looking to the stock's 'fair market value'—what an arm's length buyer would be willing to pay for the stock on the open market—is generally the best means of gauging the stock's present value."); In re Iridium Operating LLC, 373 B.R. 283, 346 (Bankr. S.D.N.Y. 2007) ("A company's stock price is an ideal datapoint for determining value.") (internal citations and quotation marks omitted).  Indeed, in other contexts, courts have held that pink sheet values are an accurate assessment of the true value of a stock.  See, e.g. Hurley v. Fed. Deposit Ins. Corp., 719 F. Supp. 27, 33 (D. Mass. 1989) (holding that pink sheets accurately reflect the value of stock, so long as the market for the stock is able to "obtain[] material information about a company and accurately reflect[] that information in the price of the stock").

   The Insider Equity Holders argue that stock price upon which the Bankruptcy Court relied—45 cents a share—was not reliable because the shares were thinly traded and because the Bankruptcy Court only relied on the price on one day—May 18, 2011.  As an initial matter, this contention ignores the fact that the Bankruptcy Court also relied upon at least one other sale of MMPI stock in which 300,000 stocks were sold for $.50 just three months

15

1  beforehand.  In addition, the Bankruptcy Court relied upon the

2  statement of OEC Chairman Stephen Taylor, who testified that *35*

3  cents a share was "the price on which a buyer and seller would agree

4  in an arm's length transaction."  Moreover, in opposition to

5  Charlestown's valuation evidence, the Insider Equity Holders offered

6  nothing more the testimony of M. Freddie Reiss, whose estimate of

7  the stock price was based on the *Insider Equity Holders'* own self-

8  serving estimates of the true value of the reorganized corporation.

9  Reiss's declaration contains no indication of how he, or the Insider

10  Equity Holders, arrived at their conclusion that $278 million was

11  the proper value of the reorganized debtor, rendering this valuation

12  evidence (at the very least) suspect.

13              2. The Competitive Bidding Process

14

15      Moreover, any argument that the stock price did not accurately

16  reflect the value of the reorganized debtor is belied by

17  confirmation *process* employed by the Bankruptcy Court.  Namely, *by*

18  *permitting more than one group to propose a plan*, the Bankruptcy

19  Court tested the value of the reorganized debtor *against the market*.

20  Such valuation, the Supreme Court has concluded, is the "best way to

21  determine value."  Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N.

22  LaSalle St. P'ship, 526 U.S. 434, 457 (1999);[22] see also COLLIER §

23

24      [22] LaSalle involved the "new value" corollary to the absolute
    priority rule, which arises when a plan allows "stockholders in the

25  business that had filed for bankruptcy protection (old equity) to
    receive stock in the reorganized debtor in exchange for

26  contributions of added capital (new value) . . . even though a
    senior class was not paid in full."  In re Bonner Mall P'ship, 2

27  F.3d 899, 906 (9th Cir. 1993).  Such plans may, under "certain
    conditions," be found "fair and equitable" and in compliance with

28  the absolute priority rule.  Id.  The instant case does *not*

1129.05[3][b] ("In questionable cases, the price offered should be
checked by independent means . . . . [including] a competitive
bidding process to determine the price that a good fai[th] purchaser
would pay."); <u>Prince</u>, 85 F.3d at 320 ("[W]here stock is traded
infrequently (or only once), recent sales may not be as reliable an
indicator of current value as the equilibrium market price for a
stock that is heavily traded . . . [h]owever, here [the buyer and
seller] negotiated the stock's sale price at arm's length . . . *as a
result, the agreed-upon purchase price is likely to represent a
reasonably accurate estimation of the present value* [of the present-
day value of stock of a bankrupt corporation]").

Although it did not explain its actions in these terms, the
Bankruptcy Court, in effect, conducted a competitive bidding process
for the reorganized debtor.  The Bankruptcy Court permitted three
separate groups—the Insider Equity Holders, Charlestown, and the
Legendary group—to propose plans, and with each iteration of a plan,
the parties effectively bid more for the reorganized debtor.  The
very first plan proposed by the Insider Equity Interests *eliminated
pre-petition equity interests entirely*, and permitted an investor to
receive 100 percent of MMPI in exchange for $10 million.  ER 1830 ¶
11.  Before any other entity was permitted to file a plan, the
Insider Equity Holders filed a series of amended plans; their best
treatment of equity came in their July 10, 2010 propose, in which

implicate the new value corollary because there is no dispute that a
creditor was not paid in full while an equity owner retained value
in the reorganized debtor.  Rather, the instant case involves a
dispute between two groups of equity holders, in which one argues
that it got less than its fair share of the reorganized debtor.

they gave equity holders the option of selling their shares for 8
cents a share or purchasing for seven cents a "number of shares in
reorganized MMPI equal to the number of existing shares they held in
MMPI." ER 1831. Once the Bankruptcy Court permitted Charlestown to
file a Plan, the proposed treatment of equity improved remarkably:
in its July 14, 2010 plan, Charlestown permitted pre-petition equity
holders to receive 16 cents a share, ER 1832; in their September 21,
2010 plan, the Insider Equity Holders permitted pre-petition equity
holders to receive 25 cents a share, ER 1833; and in their October
14, 2010 plan, Charlestown permitted shareholders to receive 35
cents a share, ER 1834. This type of bidding process has been
explicitly endorsed by the Supreme Court as the "best way to
determine [the] value" of a reorganized debtor. See LaSalle, 526
U.S. at 458 (holding that the value of a reorganized debtor may be
assessed wither by giving competing interests the opportunity to
"offer competing plans" or by giving competing interests the "right
to bid" for the equity in the reorganized debtor); see also COLLIER §
1129.04[3][b] ("[T]he plan may call for the acquisition of the
[reorganized debtor] by a third party, and the plan will call for
the equity interests [in the reorganized debtor] to be issued to the
third party in exchange of the consideration the third party is
offering. In this case, the bankruptcy court will have to assess
the transactions to ensure that the price being paid and the manner
in which the acquisition is being made is fair. *In a competitive
bidding situation . . . the court will be able to rely upon this
market mechanism to provide evidence of such fairness.*") (emphasis
added).

1     In other words, the competitive bidding process employed by the
2   Bankruptcy Court reduces any concern that the pink sheet price
3   undervalued the reorganized debtor's stock.  So too does the
4   Bankruptcy Court's finding that the Final Charlestown Plan was the
5   best deal available to *both creditors and equity interests*.
6   Pursuant to Section 1129(c), the Bankruptcy Court was required to
7   "consider the preferences of creditors and equity security holders
8   in determining which plan to confirm" because there were two plans
9   proposed during the bankruptcy process.  11 U.S.C. § 1129(c).  In
10  this case, the Bankruptcy Court held that the Final Charlestown Plan
11  was preferable to the Final Insider Equity Holders' Plan because the
12  former plan "encompasse[d] agreements with $70 million of secured
13  debt which still must be crammed down in order for the [final
14  Insider Equity Holders' plan] to be confirmed.  An additional $60
15  million of secured debt which has accepted both plans has express to
16  the Court that it 'strongly' prefers the [Final] Charlestown Plan.
17  The [Final] Charlestown Plan also encompasses *certain* settlements
18  and compromises that the [Insider Equity Holders] have *chosen not* to
19  make."  ER 1891.  Moreover, the stock price offered to equity
20  interests under the Final Charlestown Plan—35 cents a share—was
21  better than the stock price offered to equity interests under the
22  Final Proposed Insider Equity Holders Plan—25 cents a share.  See ER
23  1833-1834.  Finally, the Non-Insider Equity holders "voted
24  overwhelmingly in favor of the Charlestown Plan and [their] official
25  representative, the OEC, strongly supports confirmation of the
26  Charlestown Plan."  ER 1890.  The Bankruptcy Court's finding that
27  the Final Charlestown Plan satisfied the "best interests of
28  creditors" *and* Non-Insider Equity Holders—a finding *not* appealed by

the Insider Equity Holders—is further evidence that the Insider
Equity Holders got as much as they were entitled to once creditors
were made whole.  See Bruce A. Markell, Owners, Auctions, and
Absolute Priority in Bankruptcy Reorganizations, 44 STAN. L. REV. 69,
121 & n.306 (1991) ("If the [competitive bidding process is]
followed, creditors may receive two plans simultaneously . . . .
[I]f there are more than two plans, creditor preferences should
again control.") (citing 11 U.S.C. § 1129(c)).

Indeed, the Insider Equity Holders' argument that they got less
than the fair market value of their shares is belied by their own
action (or inaction) in this case.  An example shows why.  The
Insider Equity Holders repeatedly argue that, based on *their own*
estimates, the "net equity value" of the company was approximately
$278 million.  If this was the true value of the reorganized debtor,
a 55 percent ownership stake in the corporation would have been
worth $152.9 million.  However, the Final Charlestown Plan (as
proposed) would have given MMPI Acquisition a 55 percent share in
the reorganized debtor for a mere $16.9 million.[23]  Thus, according
to the Insider Equity Holders' equity estimate, the Final
Charlestown Plan (as proposed) would have rewarded MMPI Acquisition
with a $136 million windfall.

However, *the Insider Equity Holders themselves* failed to
propose a plan superior to the Final (proposed) Charlestown Plan.
Given the alleged $136 million windfall coming to MMPI Acquisition,

---

[23] There were approximately 88 million shares of stock; and
purchasing 55 percent of those shares (48.4 million) at 35 cents a
share would have cost MMPI Acquisition approximately $16.9 million.

the Insider Equity Holders would have had every incentive to make a more competitive bid *were the reorganized debtor in fact worth $278 million*, yet they did not.  Were the Insider Equity Holders' valuation estimates accurate, they could have proposed a plan that would have paid off the remaining secured claims that were impaired under their final proposed plan (approximately $70 million worth of claims), and still given each pre-petition equity holder a total of $1.10 a share.  Moreover, had they in fact proposed such a plan, the Bankruptcy Court would have been compelled to choose it over the Final (proposed) Charlestown Plan pursuant to the best interests of creditors test.  The Insider Equity Holders' failure to propose a superior plan—one that reflected the $278 million valuation figure they argue was correct—severely undermines their argument that MMPI Acquisition received their share of the reorganized debtor on the cheap.

### C. Procedural Defects

In addition to their substantive argument, the Insider Equity Holders argue that the Bankruptcy Court erred in relying upon the pink sheets because they were not submitted as part of the record, and because the Bankruptcy Court did not give them sufficient time to prepare arguments and evidence as to why the pink sheet price was incorrect.  Although the Bankruptcy Court gave the Insider Equity Holders only a limited opportunity to dispute the pink sheet price at the May 19, 2011 hearing, it gave further consideration to the Insider Equity Holders' valuation arguments when it considered, and rejected, the Insider Equity Holders' motion for reconsideration on the valuation methodology it employed.  ER 1991-1992.  In addition,

it was not erroneous for the Bankruptcy Court to take judicial
notice of the pink sheet price.  See In re NAHC, Inc. Sec. Litig.,
306 F.3d 1314, 1331 (3d Cir. 2002) (affirming a district court's
taking of judicial notice of stock price); Johnson v. Wiggs, 443
F.2d 803, 806 (5th Cir. 1971) (noting that pink sheet quotes are "in
the public domain"); see also Fed. R. Evid. 201(b)(2) (permitting
judicial notice of facts that are "capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably
be questioned").  Indeed, the Insider Equity Holders do *not* argue
that the Bankruptcy Court inaccurately recorded the pink sheet
price; only that the use of the price itself was a faulty
methodology.  Their argument is *legal*, *not* factual.

    Moreover, any procedural irregularity in this case was harmless
error.  The Insider Equity Holders do *not* dispute that they were
given ample opportunity to respond to and present arguments as to
why the Final Proposed Charlestown Plan's 35 cents a share proposal
was inaccurate.  In other words, the procedural irregularities
identified by the Insider Equity Holders *benefitted* them, rendering
these alleged errors harmless.  See United States v. 191.07 Acres of
Land, 482 F.3d 1132, 1137 (9th Cir. 2007) ("The district court erred
by applying a valuation method to which no one testified and which
lacks a basis in the record.  However, the compensation awarded on
the district court's theory was higher than it would have been if
the district court had accepted [an expert's] approach.  The error
was harmless."); see also Boyd v. City & Cnty. of San Francisco, 576
F.3d 938, 943 (9th Cir. 2009) ("A party seeking reversal for
evidentiary error must show that the error was prejudicial[.]").

1

### IV.  CONCLUSION

2      For the reasons put forward in this Order, the Bankruptcy

3  Court's decision is AFFIRMED.

4  IT IS SO ORDERED

5

6  August 7, 2013
   DATE                          THE HONORABLE  STEPHEN V.  WILSON
7                                 UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28